1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AMERICAN COUNCIL OF THE BLIND, a District
of Columbia non-profit corporation, SCARLETT
MILES, MARVELENA QUESADA, ARLENE
DOHERTY, ALICE MARJORIE DONOVAN,
BILLIE JEAN KEITH, GEORGE P. SMITH, MARY
ANN ALEXANDER, and LAURA M. RUSSELL on
behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

MICHAEL ASTRUE, Commissioner of the Social
Security Administration, in his official capacity,
and SOCIAL SECURITY ADMINISTRATION,

        Defendants.

                            /

No. C 05-04696 WHA

**FINDINGS OF FACT
AND CONCLUSIONS
OF LAW AFTER
BENCH TRIAL**

## INTRODUCTION

    This nationwide class action challenges the adequacy of alternative modes of

communication by the Social Security Administration in its notices and other correspondence to

the blind and visually impaired.  This order is the decision of the Court following a bench trial.

## PROCEDURAL HISTORY

    Plaintiffs represent two classes of blind or visually impaired individuals that receive

benefits from the Social Security Administration for themselves or as representative payees on

behalf of others.  Also a plaintiff is the American Council for the Blind, a national membership

organization of visually impaired persons.  In 2005, their action was commenced to compel SSA

to provide alternative formats of communication that would enable the class to have more equal access to participate in SSA programs.  The alternatives include Braille, large print, electronic mail, computer disks, and audiotape recordings.  Plaintiffs seek relief under Section 504 of the Rehabilitation Act of 1973 and the due process clause of the Fifth Amendment.  Plaintiffs seek declaratory relief and a permanent injunction, not damages.

An order dated April 23, 2008, denied SSA's motion to dismiss for lack of subject-matter jurisdiction, holding that:  (i) plaintiffs' claims were not subject to the jurisdictional bar of Section 405(h) of the Social Security Act; (ii) a private right of action for equitable relief under Section 504 of the Rehabilitation Act exists under Ninth Circuit precedent; (iii) jurisdiction was therefore proper under 28 U.S.C. 1331; and (iv) plaintiffs stated a claim under the Rehabilitation Act (Dkt. No. 78).  The Rehabilitation Act, not the Social Security Act, the order held, established the basis for plaintiffs' discrimination claims, the Rehabilitation Act having created a duty on the agency to provide meaningful access to participants.  Contrary to SSA, its obligations under Section 504 of the Rehabilitation Act were not limited to the special-notice provisions of 42 U.S.C. 421(l), 1383(l).  The order also held that the agency was obligated by the Rehabilitation Act to provide special services to blind recipients without regard to whether blindness is the basis for their benefits and notwithstanding the special-notice provisions in the Social Security Act.

Once that important question was decided, the April 2008 order also requested both sides' views concerning the best approach going forward and presented four options, including: (i) continue the litigation; (ii) stay the case so the agency could pursue rulemaking under Section 504 in the first instance; (iii) remand the action to the agency for rulemaking; or (iv) certify the order for interlocutory review.  In response, both sides insisted that the best course of action was to continue the litigation.

A later order denied SSA's motion to dismiss plaintiffs' due process claims (Dkt. No. 83). Because significant factual disputes existed, the order could not conclude as a matter of law that the agency provided sufficient notice under the due process clause.  The parties also disagreed as to which test provided the appropriate legal standard.  Declining to decide the applicable legal

United States District Court

For the Northern District of California

1    standard, the order concluded that if plaintiffs' alleged facts were true, then they plausibly could

2    be entitled to relief under either standard.

3         An order dated September 11, 2008, certified two classes (Dkt. No. 126 at 10):

4         Individuals with visual impairments that substantially limit the
          major life activity of seeing who require that materials be in an
5         accessible format in order to participate in the Social Security
          Administration's Old-Age, Survivors, and Disability Insurance
6         program or the Supplemental Social Security Income program as
          applicants, beneficiaries, or recipients, but not as representative
7         payees with the class representatives being Tammy Renee Cooper,
          Scarlett Miles, Marvelena Quesada, Arlene Doherty, Alice Marjorie
8         Donovan, Billie Jean Keith, George P. Smith, Dorothy Jackson,
          Mary Ann Alexander, and Laura M. Russell.

9                         *              *              *

10

11        Individuals with visual impairments that substantially limit the
          major life activity of seeing who require that materials be in an
12        accessible format in order to participate in the Social Security
          Administration's Old Age, Survivors, and Disability Insurance
13        program or the Supplemental Social Security Income program as
          representative payees with the class representatives being Mary
14        Ann Alexander and Laura Russell.

As of March 2009, class representatives Tammy Cooper and Dorothy Jackson withdrew.

15        A later order, denied the parties' cross-motions for summary judgment because of factual

16   disputes (Dkt. No. 238). The instant order follows a seven-day trial, closing arguments, and

17   lengthy proposed findings and conclusions. Rather than vet each and every proposal, this order

18   will find its own way through the evidence and arguments. Any proposal that has been expressly

19   agreed to by the opposing side, however, shall be deemed adopted (but only to the extent agreed

20   on) even if not expressly so stated herein. That a proposal has not been expressly covered herein

21   does not necessarily mean it was rejected; it only means that the Court has sifted through the

22   evidence in a different way.

23                           **FINDINGS OF FACT**

24              **TITLE II AND TITLE XVI OF THE SOCIAL SECURITY ACT**

25        1.    Pursuant to Title II of the Social Security Act, the Social Security Administration

26   provides old age, retirement, survivor, and disability insurance benefits to individuals who have

27   contributed to the program and who are disabled or are the child or spouse of such an individual.

28   42 U.S.C. 401–34.

**United States District Court**
For the Northern District of California

2. Under Title XVI, the agency provides benefits to financially needy individuals who are aged, blind, or disabled under the Supplemental Security Income program. 42 U.S.C. 1381–83f.

3. Approximately 53.1 million beneficiaries receive Title II benefits, and 7.5 million receive Title XVI benefits. The programs pay approximately $60 billion in benefits per month.

4. SSA has more than 65,000 employees nationwide. This includes about 52,000 employees in 1,300 field offices, 35 teleservice centers, and six program service centers.

5. SSA sends about 350 million notices and forms per year, which includes 100 million notices that are individualized. The agency sends out approximately 2.2 to 2.7 notices per year to each beneficiary or recipient. Such notices include end-of-year statements, 1099 tax forms, change of address, changes in benefit amount, and appointment letters. In short, SSA administers a massive program serving many millions of beneficiaries.

**THE SPECIAL NOTICE POLICY**

6. In 1988 and 1990, Congress added special-notice provisions to the Social Security Act. Pursuant to these provisions, individuals receiving benefits or applying for benefits on the basis of blindness are entitled to elect from three different methods of receiving notices of any decision or determination: (i) a mailed notice with a follow-up telephone call; (ii) certified mail; or (iii) "notification by some alternative procedure established by the Commissioner of Social Security and agreed to by the individual." 42 U.S.C. 421(l), 1383(l). Pursuant to the Act, SSA established its "Special Notice Policy." A central question in this case is whether this procedure is adequate under the Rehabilitation Act and due process clause.

7. As enacted, the Special Notice Policy only applied to individuals applying for or receiving benefits "on the basis of blindness." There are now approximately 250,000 individuals receiving benefits on the basis of blindness. In 2006, after the action commenced, however, the agency voluntarily extended the options to also include visually impaired participants in the Title II and Title XVI programs, and not just individuals receiving benefits on the basis of blindness. There are now approximately three million blind and visually impaired individuals receiving benefits under Title II and Title XVI.

4

8.      Pursuant to SSA's Special Notice Policy, participants may elect to receive notice of decisions and determinations either through:  (i) first-class mail followed by a telephone call from the agency; (ii) certified mail; or (iii) first-class mail.  When an option has not been elected, the default is standard print notice sent via first-class mail in the normal way.

9.      A representative payee — that is, an individual who receives benefits on someone's behalf — can elect a SNP option for receiving notices only if the representative payee resides at the same address as the beneficiary or recipient.  SSA does not collect or store information regarding whether a representative payee is blind or visually impaired.

10.     The agency includes its operating policies, including the SNP, in its Program Operations Manual System ("POMS").  POMS, however, is not completely current, meaning that POMS NL 00603.030, the most pertinent provisions, only informs agency employees to provide SNP options to "individuals applying for or receiving [T]itle II or [T]itle XVI disability benefits *by reason of blindness*" (TX 2 at 1).  It does not state that the policy was extended to those with a visual impairment.

11.     To meet this omission, a separate document — an Emergency Message titled EM-08066 — has informed employees about the extension to others.  This emergency message was published on June 30, 2008, after the order herein denying a motion to dismiss.  (The agency was not ordered to do so.)  EM-08066 stated that the SNP also applies to individuals who allege a visual impairment, not just individuals receiving benefits based on blindness.  In particular, it stated that "[s]ince system changes in 2006, coding of a special notice option for Title II beneficiaries and Title XVI recipients has been mandatory for individuals receiving benefits based on blindness but optional for individuals who allege a visual impairment but are not receiving benefits based on blindness."  It also notified agency employees that representative payees who live at the same address as the beneficiary or recipient may elect a SNP option.

12.     POMS is available on the agency's internet and intranet sites.  A link on the agency's intranet site for POMS NL 00603.030 provides access to EM-08066.

13.     The SNP only applies to notices of "any decisions, determinations or proposed action that affect an [individual's] right under [T]itle II or [T]itle XVI" (TX 2 at 1).  It is not

5

United States District Court

For the Northern District of California

applicable to appointment confirmation letters, cost-of-living-adjustment notices, routine correspondence (*e.g.,* requests for additional medical information) or supplemental material (*e.g.,* pamphlets). Rather, SSA policy only requires that certain notices, as listed above, be read and instructs the recipient to seek help with any supplemental material from a local field office.

14.     When the SNP was first established, the agency sent standard print mailers to Title II and Title XVI recipients receiving benefits based on blindness. It included a letter spelling out the three SNP options. It also included a postcard that an individual could complete and return indicating their preferred option. After the agency extended the SNP to the visually impaired, it did not send out a mailer or other written notification to tell them about the expansion. Now, the agency's procedure is to offer the options to individuals who are blind or visually impaired when they apply for benefits or undergo a redetermination of eligibility for benefits.

15.     The SNP is beneficial to some blind and visually impaired individuals, particularly the telephone-call option. When a notice needs to be read, notices for Title II individuals are sent to the processing center to be read, and notices for Title XVI recipients are sent to the field offices to be read. If an individual elects the telephone-call option, the agency's policy requires its employees to call the individual within five days of the date on the notice.

16.     If telephone contact is unsuccessful, employees are instructed to make the second and third attempts within the next two days. Employees are only required to call three times. Sometimes, an agency employee in his or her discretion may call more than three times (but is not required to do so). Employees are directed to read the entire notice verbatim to the recipient, including cumbersome tables and boilerplate. They may also answer questions during the telephone calls. POMS instructs employees to "[i]nform the claimant that a copy of every notice will be mailed to him/her. Therefore, advise the claimant that it is his/her responsibility to rely on the paper notice for their rights and responsibilities, *e.g.*, due process or appeal rights" (TX 2058). In some instances, the agency's attempts to contact the individual by telephone are unsuccessful. Agency employees are told that proposed agency action should *not* be canceled solely because the

United States District Court

For the Northern District of California

1    notice was not read to the individual after three unsuccessful attempts at telephone contact.

2    In such cases, in other words, the agency stands on the written notice as adequate.

3         17.    Recently, the agency notified employees that they may annotate notices in the SSA

4    online retrieval system when they have read it to an individual.  Before this policy was

5    announced, some employees annotated the notice itself and placed it in the paper file.

6         18.    While the SNP provides three options, it essentially only provides one option

7    besides standard print and that is the supplemental telephone call.  The supplemental phone call

8    is beneficial to some blind and visually impaired individuals.  But it also burdens the agency.

9    For instance, some field office employees complain vociferously in a few cases about having to

10   read the entire notice.  These complaints stem from the fact that the notices sometimes contain

11   boilerplate language that can be two to three pages long.  Reading a notice, such as a lengthy

12   overpayment notice, can take at least thirty minutes.  (On the other hand, it takes much less time

13   to read a short appointment letter.)  Further lengthening the process are the questions individuals

14   ask while the employees are reading the notice.  Reading a long notice verbatim may be

15   frustrating not only to the person reading it but also to the person who is listening.

16        19.    A statistical report as of June 22, 2008, shows that 12,977 individuals have elected

17   to have a supplemental telephone call to have notices read.  This data was collected before the

18   publication of EM-08066 announcing to employees that the SNP was expanded to include

19   visually impaired individuals as well as the blind.

20        20.    Despite some shortfalls in execution, some of which are outlined below, the SNP

21   is generally administered by SSA in a sincere and well-intentioned way.  The agency has made

22   a reasonable and good faith effort to implement its SNP.  The main issue is not shortfalls in the

23   implementation but rather shortfalls in the concept itself, meaning whether the SNP, even if

24   executed with perfection, measures up to the requirements of Section 504.

25                    **THE TOLL-FREE NUMBER AND FIELD OFFICES**

26        21.    Besides the SNP, SSA offers a toll-free number, 1-800-772-1213, that anyone,

27   whether blind or sighted, may call to ask questions or have a notice read over the phone.

28   The phone center is staffed by teleservice representatives from 7 a.m. to 7 p.m., on weekdays.

United States District Court

For the Northern District of California

1    Automated telephone service is available 24 hours a day.  SSA informs the public they can call

2    the toll-free number when the person applies and on the agency's website.

3         22.    Getting through to a live person, however, is not always easy.  In addition, some

4    notices are not available on the online retrieval system for teleservice representatives to access

5    and read to the caller.  For example, plaintiff Bernice Candarian called the agency, including the

6    toll-free number, because she wanted the agency employee to read a notice to her.  On several

7    occasions, the agency employee could not read a notice because it could not be located.

8         23.    In addition to the toll-free number, individuals can call or visit the field office to

9    have a notice read to them.  Notices created locally at field offices are not automatically put in

10   the online retrieval system and may not be immediately available when someone calls in to the

11   toll-free number or the field office.

12        24.    Field office employees may be busy with their other duties, such as interviewing

13   applicants, which takes time away from being able to read a notice.  It is sometimes difficult to

14   get through on the telephone to a field office employee.

15        25.    According to the testimony of Karen Sims, a SSA district manager for the San

16   Mateo County Office, it would be faster to copy a long letter in Microsoft Word, burn it to a CD,

17   and then mail it to the recipient than to read it verbatim over the phone.  Simply put, reading a

18   notice verbatim over the phone is time consuming.  This existing burden is a factor to consider in

19   weighing the comparative advantages of other modes of communication with the blind and

20   visually impaired.

21                              **"GOOD CAUSE" RELIEF**

22        26.    The date a person receives a notice is presumed to be five days after the date on a

23   notice, unless the individual can prove otherwise.  Then, the person has ten days after receipt of a

24   notice to file a written appeal request and a request for his or her payments to continue while the

25   appeal is pending.  The person has sixty days to appeal.  If a request has been made, the person's

26   benefits will not be reduced until after there is a decision on the appeal and a reduction is

27   determined to be necessary.  If a written appeal request is received after the ten-day period, a

28   written request for good cause is required.

**United States District Court**
For the Northern District of California

27.     SSA's "good cause" waiver policy allows individuals to file untimely appeals and requests for reconsideration.  To obtain a waiver, an individual must show that they have good cause for filing the request late.  In determining whether good cause exists, employees are told to consider whether the individual's physical limitation (*e.g.,* blindness) prevented him from filing a timely request or from understanding or knowing about the need to file a timely request for appeal.  But it may or may not be considered good cause, depending on the circumstances.

**SHORTCOMINGS OF THE SNP**

28.     There are several drawbacks to the SNP from the perspective of blind and visually impaired individuals.

29.     One is that POMS does not instruct employees to make calls at different times of the day.  The phone calls are not timed for when a recipient is most likely to be at home to receive a call.  Failing to call at different times increases the likelihood that the individual will not be reached.  Also, some individuals may have structured activities during the business hours of 9 a.m. to 5 p.m.

30.     Another drawback is that some plaintiffs have only received a SNP telephone call only a few times over many years.  For instance, plaintiff Mary Ann Alexander received only one call in over three years after electing the SNP telephone call in 2006.  Similarly, although plaintiff Bernice Candarian selected the telephone call option in the early 1990s, she has only received two calls from SSA to read a notice since then.

31.     While POMS instructs employees to read the entire notice, some employees fail to do so.  For example, Bernice Candarian received a call and an agency employee only paraphrased the contents of a notice and refused to read it verbatim.  One SSA district manager acknowledged she has "documented" employees for not reading the entire notice and has reminded them of the policy and re-trained them to do so in the future.

32.     Class members must listen to the cumbersome reading of boilerplate and tables. This makes it hard to comprehend the essence of the notice.  Having someone read over the telephone does not compare to being able to absorb the information independently in order to study it, review it, and comprehend at one's own speed and mode of "reading."

**United States District Court**
For the Northern District of California

33.     A major problem with the telephone notice is that class members cannot be expected to recall the full notice later.  Everyone who receives an important notice needs to be able to store it and retrieve it for later use.  The blind and visually impaired need to do so as well.  When a blind individual prepares a response to an important notice, he or she must, under the SNP, wait until a relative, neighbor, or other reader can re-read the document to them or wait to reach an employee on the toll-free number, which is only available weekdays and only from 7 a.m. to 7 p.m.  In addition, a person cannot earmark key passages in the standard print notices.

34.     It is true that the individual could call the agency to have the notice read again but, as stated, that opportunity is limited to twelve hours a day, only on weekdays and is hit or miss anyway.  Thus, the information in notices is not readily available at times when the individual may be able to prepare a reply.  So the individual still faces the problem of trying to remember the notice contents verbatim.  (To make matters worse, some notices are not available on the agency's online retrieval system.)

35.     There is only sporadic and anecdotal evidence in the record that any blind and visually impaired recipients have had their benefits reduced or terminated without ultimate reinstatement due to a lack of an accessible format.

36.     One example is the experience of Mary Ann Alexander.  Ms. Alexander is blind with some light perception.  Ms. Alexander was the representative payee for her minor daughters.  In 2002, she received a notice from the agency stating that it had reduced one of her daughter's benefits because of overpayment.  She does not know whether there was a prior notice regarding this issue.  Ms. Alexander filed a late request for reconsideration.  Her employer, an attorney, wrote letters on her behalf and the agency accepted her late requests for reconsideration.  A year later, when the issue still had not been resolved, she also wrote a letter to her congressman and finally the agency responded in a letter.  That letter acknowledged that the agency had been in error and would reinstate her daughter's benefits.  It took fourteen months to resolve this.  For those fourteen months, she had less income for her household.  On another occasion, she did not submit her daughter's accounting form on time.  SSA accepted the late filing of the form, however, and did not suspend her daughter's benefits.

**United States District Court**
For the Northern District of California

37.     Another example is the experience of plaintiff Marvelena Quesada. Ms. Quesada is totally blind.  The agency reduced Ms. Quesada's benefits because of an overpayment.  The overpayment resulted because Ms. Quesada failed to report her work expenses and she was unaware that she had to report blind work expenses.  She represented that she did not have access to the program rules regarding blind work expenses and no one at SSA read them to her.  Because of the reduction, she had difficulty paying her rent, buying food and clothing, and paying her bills.  But Ms. Quesada failed to inform SSA that her address had changed and she no longer lived with her mother.  (It is unclear whether this information was sent to her mother's address.)

38.     Plaintiff Arlene Doherty had a similar experience.  Ms. Doherty is totally blind. In 1997, Doherty received a letter from SSA requesting that she complete an enclosed application within ten days or she might lose her benefits.  The letter requested that she answer the circled questions, sign where there were checks, and sign her initials next to any corrections.  SSA did not call her to read this notice and did not offer to help her complete the application.  But there is no evidence in the record as to whether Doherty had selected the SNP telephone option in 1997.

39.     In sum, the evidence is only anecdotal as to the aggravation caused by the SNP and the extent to which class members have lost benefits as a result of its shortfalls.  No survey of class members was presented, for example.  In light of the overall record, however, it seems clear that the SNP is not effective for some blind and visually impaired individuals.

**PLAINTIFFS' REQUESTED ALTERNATIVE FORMATS**

40.     Plaintiffs seek to have the agency offer a menu of alternative formats of communications, including Braille, large print, electronic mail, computer disks, and audiotape recordings.

41.     Some of the class members previously asked SSA to provide an alternative format other than standard print or a supplemental telephone call:  Mary Ann Alexander asked generally for an alternative format; Billie Jean Keith asked for large print multiple times; Scarlett Miles requested a cassette tape and email multiple times; Bernice Candarian requested large print;

1    Marvelena Quesada asked for Braille, email, and CD.  SSA routinely denies individuals' requests

2    for alternate formats.

3           42.    SSA does not consider requests for alternative formats.  If an alternative is

4    requested, the agency employee is instructed to tell the person that the alternate option is not

5    offered and to inform him or her of the SNP option.

6           43.    Plaintiff American Council of the Blind, an organization with about 20,000 blind

7    and visually impaired members, provides a monthly magazine in Braille, large print, audio

8    cassette tapes, email, and CD.

9           44.    Other entities, including banks, telephone companies, gas and electric companies,

10   and state government, provide alternate formats, specifically Braille and email, to class

11   representatives.  This includes individualized information.  Outside of SSA, this is increasingly

12   available as a service to the blind and visually impaired.

13          45.    SSA also provides some publications on its website and, upon request, in Braille,

14   audio cassette tapes, CD, or large print.  For example, a publication entitled "If You are Blind or

15   Have Low Vision — How We Can Help" is provided in Braille.

16                                         **BRAILLE**

17          46.    One of the requested alternative formats is Braille.  Braille has been used by blind

18   and visually impaired individuals for many years.  Less than ten percent of the blind and visually

19   impaired can read Braille.  Most refer to "Braille" as paper-embossed Braille.  Paper-embossed

20   Braille is created with a Braille printer that has pins that make indentations on the back of the

21   paper so that the individual can feel the indentations.  Using personal embossers, individuals can

22   also make their own paper Braille.

23          47.    Some blind and visually impaired individuals, especially those who are blind early

24   in life, learn Braille in school.  Those who learn it early can read it very quickly, effectively at a

25   rate of 200 or 300 words a minute, including tables and charts.  Those who have lost their vision

26   later in life are less likely to learn Braille or, if they do, they usually cannot read it as fast.

27

28

United States District Court

For the Northern District of California

48.     The paper Braille option does not require a person to use a computer to access the information in the notice.  Thus, there is no computer technology barrier for the blind and visually impaired using paper Braille.

49.     A paper Braille document can be delivered through standard mail.  According to plaintiff's expert testimony, Braille is often the first choice as a way to receive information for those who can read it.

### LARGE PRINT

50.     Another requested alternate format is large print.  It is generally used by individuals with low vision.  Large print is merely a larger version of a print document.  For a document to be considered large print, it must be at least 14-point, but the optimal size is 18-point.  Large print can usually be generated using a word processor by assigning a larger font.  This presents a problem in some instances when the increased font size is so large that the text, in a table for example, does not wrap properly.  This presents a practical limitation to the size that can be used effectively.

51.     Besides large print, there are other tools that people with low vision regularly use to read standard print.  For example, ordinary glass magnifiers are commonly used to increase the size of a standard or large print document.  Some individuals use digital magnifiers, or closed-circuit televisions, which will magnify a document and project it on a screen.  There are also commonly available handheld digital magnifiers about the size of a paperback book that show a document on the screen.  In addition, there are large print display software programs that can be used with a computer to enlarge text on the screen.  With this specialized software, one can assign different font sizes.

52.     A large print letter or notice can be sent via standard post, although the page size may be larger than the standard size.

### AUDIO TAPE RECORDING

53.     One type of audio recording is an audio cassette tape recording.  This is old technology.  This records a human voice in analog form on a cassette tape.  An audio cassette player is required to listen to a cassette tape.  The benefit of a cassette tape is that one can rewind

13

it and review the information.  But it is limited to just going forward or backward and cannot be "navigated" as effectively as newer technologies discussed below.  Audio cassette tapes are being phased out.  There has been a steady trend to digital recordings and away from cassette tapes.

### AUDIO CD RECORDING

54.     Audio recordings may also be available on CDs.  An audio CD player is required to listen to an audio CD.  This is a newer technology than cassette tapes.  The sound is converted to digital information and stored as such and the process is reversed for playback.  Because screen readers do not work for an audio CD player, navigation is not available, except that if a notice is broken up into sections, the CD player can tab forward (or backward) to the next segment in the same way we all tab forward and backward in listening to music CDs.

### DATA CD

55.     More pertinent is a data CD, not an audio CD.  On a data CD, there can be a variety of files, including text, like a Microsoft Word document.  It can be navigated using software to read the information.  A data CD with a Word or WordPerfect document on it can be read with a screen reader.  If a table is created in a Word document, then Word automatically creates the structure for the table.

56.     There are commercial screen readers that the blind and visually impaired can use with a computer to read alphanumeric information.  Window-Eyes and JAWS are two examples.  Free screen readers are also available online, including Open Source.  A screen reader can be used to read out loud documents in a word processor, such as Microsoft Word.  If a notice is sent in a format that can be opened by Microsoft Word, then a person could use Microsoft Word and a screen reader to read the notice.  Dr. George Kerscher demonstrated this at trial.  Mary Ann Alexander testified that as a legal assistant she uses a computer equipped with JAWS to read documents.  A benefit of a CD with Microsoft Word is that it provides a permanent re-accessible record.

57.     The DAISY system demonstrated by Dr. Kerscher included a data CD with a variety of files, including audio recordings and text.  It was navigated using conforming software.  DAISY stands for the Digital Accessible Information System.  The DAISY consortium is a

14

United States District Court

For the Northern District of California

worldwide consortium that was started by libraries who produce alternate formats for the blind and visually impaired and whose goal is to standardize how libraries could provide information to such individuals.  The DAISY system is a United States standard, also referred to as the ANSI/NISO Z39.86 specification for digital talking books.  ANSI is the American National Standards Institute, which certifies specifications.  NISO is the National Information Standards Organization, which is a standard organization primarily focused on library and information services that are ANSI-certified.

58.     A computer can easily use text-to-speech technology to create a voice reading the contents.  Computer programs provide extensive navigation and the ability to go to particular chapters, sections, and pages of a document.

59.     The agency has provided a data CD of a Word document to at least one beneficiary, plaintiff Alice Marjorie Donovan, proving that it can be done in our context.  More particularly, Karen Sims, an agency manager in the office in question, sent SSA notices on CDs to Ms. Donovan for three years.  This, however, was not typical agency practice.  To prepare and send the CD, Sims cut the logo graphics out of the notices, redacted Ms. Donovan's Social Security number, copied the content of the letter to a Microsoft Word document, burned it to a CD, and mailed the CD to Ms. Donovan.  While noting it was time consuming, Sims testified, "[b]ut what you're trying to do is make sure that the person understands what's going on, and is able to use it in their system.  So that's what we did" (Tr. 838:16–18).  Sending the CD saved the time the field office would have spent reading the notice over the telephone.

60.     In at least the San Mateo County field office, the claims representatives, service representatives, and technical experts have their own computers with CD burners.  There is also an external CD burner that employees can use.  Employees can also burn notices from the agency's central online retrieval system onto a CD.

61.     In addition, if any individual nationwide requests a copy of his or her disability file, the field office copies it and burns it to a CD to give to the individual.  The CD may contain notices.

**EMAIL**

62.     The blind and visually impaired can also read emails using a screen reader. The same features and functions that can be used to read or create a document in Microsoft Word can be used for email.  Likewise, a screen reader can be used to read email attachments that are Word files or html files.  A Word file attachment would be opened in Microsoft Word, and an html file attachment would be launched in the computer's default web browser.  Screen readers also work well to read and to navigate website browsers, such as Internet Explorer and Mozilla Firefox.

63.     The agency has used email to communicate with at least one beneficiary. Once again, it was Karen Sims and the San Mateo County field office.  They emailed back-and-forth with Marjorie Donovan.  The local office had generated many local notices, including requests for information.  The notices included individually tailored information as well as boilerplate appeal language.  They would redact her Social Security number for security reasons.  They stopped emailing her, however, when they realized it might endanger her personal identifiable information.  They told her it was not safe for her information to be sent that way. The local office came up with an alternative, and began to send her notices on CD, as discussed above.

64.     According to SSA policy (TX 2088, 2094), if there is a strong business need, emails can be sent but personal identifiable information should be protected in an attachment that is encrypted or password protected, for example by using WinZip.  This policy seems to be intended for business related emails and not for routine Title II and Title XVI notices.

65.     Class counsel represented in the opening statement that the IRS communicated with the blind by email, but no such evidence was introduced at trial.  No federal agency seems (at present) to *send* emails to any person (beneficiary or taxpayer), at least where such emails would contain personal identifiable information.  However, many agencies, including SSA, allow applicants to *apply* electronically for benefits.  The difference is that the agency *receives* incoming data but does not *transmit* sensitive data outside the agency.

United States District Court

For the Northern District of California

16

**HOME SCANNERS**

66.     A blind or visually impaired individual at home can "read" a standard-print notice using a combination of his or her own scanner and voice synthesizer.  For this, the print document would be scanned using a home scanner of the type already used by millions of Americans.  The information is converted using optical character recognition ("OCR") and optical structural recognition ("OSR").  OCR takes an image of a document and through a series of algorithms attempts to identify the words in the image and OSR attempts to extract the structure in the document image.  Then, after scanning the document and using OCR/OSR software, he or she could use a voice synthesizer to listen to the contents of the document.  This is beneficial because the individual can access the information and save and file it for future review.  But there may be errors in the conversion.  Certain words may be inaccurately identified by OCR.  It may also improperly identify table headers.  Manual intervention would likely be required to fix such errors, including someone looking at the scanned document to check its accuracy.

67.     According to the testimony of plaintiffs' expert, Dr. George Kerscher, one method of converting a standard print notice to an alternative format would be to scan the notice at home.  Then, using OCR and OSR, the notice can be converted into a "single-source file," which can be in html or xml format.  Once the html or xml version is produced, it is run through the DAISY pipeline and can be used to create other formats, including Braille, large print, audio, MP3, and Microsoft Word documents.

68.     As stated, the record is anecdotal as to the extent to which the blind and visually impaired would prefer an alternative to the SNP option.  It would have been informative to have more evidence, such as surveys, as to how many find the SNP ineffective or at least substantially less effective than their preferred method.  In addition, it would have been helpful to have a survey of SSA's program participants' preferred alternate.  Nonetheless, the record is sufficient to conclude that more than a *de minimus* number of blind and visually impaired have requested (or would request if given a clear opportunity) Braille and/or a Microsoft Word notice on a data CD and that they would prefer these alternatives to the SNP options.  If Section 85.12 notices had

United States District Court

For the Northern District of California

1    been provided by SSA to such individuals (as required by law), then we could have expected a

2    more robust record on the extent to which alternatives would better serve the class.

3                            ALLEGED BURDEN ON THE AGENCY

4         69.    SSA contends that in order to provide notices in formats besides standard print, the

5    agency would be required to change a number of computer systems, modules, and applications.

6         70.    As to collection of information, SSA employees enter data about beneficiaries and

7    recipients in input systems, namely the Modernized Claims System ("MCS"); Post-Entitlement

8    Online System ("POS"); Manual Adjustment, Credit and Award Data Entry System

9    ("MACADE"); and Modernized Supplemental Security Income Claims System ("MSSICS").

10        71.    Agency employees enter data into the input systems via the fields on their

11   computer screen.  They may enter an individual's SNP election in the relevant field.  Currently, in

12   the input systems, employees can only enter codes/values corresponding to the formats currently

13   offered under the SNP.  For example, in MCS, there are only three choices:  "1" for certified

14   mail; "2" for telephone contact; and "3" for regular mail.  If an employee enters something that is

15   not an option, he or she will receive an error message.  Therefore, to provide notices in alternate

16   formats, SSA would have to modify the input systems so employees can enter additional codes

17   corresponding to the preferred alternate format.  This, however, would be easy to do.

18        72.    Turning to storage, after an employee enters a SNP preference into the input

19   systems, for MCS and MSSICS, it goes to a pending file and then to the master file.  SSA stores

20   data in master files or databases, including the master beneficiary record ("MBR") for Title II

21   beneficiaries, and the supplemental security record ("SSR") for Title XVI recipients.

22        73.    The MBR has a field that stores an individual's SNP preference, which is called

23   the mailing method indicator field.  That field stores a single alphanumeric code.  Like the input

24   systems, it is limited to certain acceptable values.  The options are for the field to be blank when

25   there is no information, or to have a value (*i.e.,* C, T, or R) for certified mail, telephone contact,

26   or regular mail.  The MBR also has a valid value for Braille.

27        74.    Similarly, the SSR has a field referred to as the notice option indicator that stores

28   format preferences.  That field also stores a single alphanumeric code and the acceptable values

are restricted.  There are coding options for certified mail, regular mail, regular mail with supplemental telephone call, Braille via certified mail, Braille via regular mail, and Braille with a supplemental telephone call.

75.     There are valid values for Braille in the MBR and SSR because it was offered as an option early on but was later discontinued by SSA.  Why it was discontinued is not clear.

76.     To provide alternate formats, SSA contends it would have to modify the MBR and SSR to store additional format preferences.  William Zielinski, an agency employee, conceded at trial that to add more acceptable values the agency could modify the software code.  He stated that it is not a matter of whether such a modification would be difficult or not; rather, the agency is concerned about having to do tests and vetting the larger systems after making a change.  But the agency has made past changes and has still managed to survive.  Changes are made to the MBR and SSR approximately every three to four years.  Many of the changes have related to collecting new and different information about a person and thus required adding additional data values.  SSA plans to modernize the MBR and SSR by converting the master files to new database formats, with the SSR conversion scheduled to start in 2011 and the MBR conversion set to begin in 2012.

77.     When SSA plans to change the master files, it does a risk assessment of the types of information to be changed and what areas might be affected.  Based on the risk assessment, the agency determines where to perform direct testing for changed functions and where to do regression testing.   The agency also determines the degree of testing required.  Despite the fact that this litigation has been going on for over four years, no such risk assessment has been conducted as to the proposed alternatives.

78.     When Mr. Zielinski testified at trial, the Court inquired on this subject (Tr. 1097:11–17):

> **THE COURT:**  Have you done that risk assessment in this case?
>
> **THE WITNESS:**  I have not done that risk assessment, nor have —
>
> **THE COURT:**  Has anyone in the agency done that risk assessment?
>
> **THE WITNESS:**  Not to my knowledge.

United States District Court

For the Northern District of California

79.     Given that the agency is well-equipped to do analyses of this sort, the failure to do a risk assessment associated with plaintiffs' proposals suggests the agency realizes that the risk would be at the low end.  Nevertheless, a minimum level of testing would be conducted for any change for the MBR and SSR.  But beyond that minimum level no determination has been made as to how much more testing would be required to make changes necessary to provide the requested alternate formats in this case.

80.     The agency does not have information on the costs of creating the SNP option field in the master files.  Nor does it have any information as to how much it cost to add the Braille option as a valid value in the master files.  There is also no estimate as to the cost of adding additional valid values in the master files for plaintiffs' requested alternative formats.

81.     Yet another system, the representative payee system ("RPS"), stores information regarding representative payees for SSA programs.  There is no field to store the representative payee's format preference.  So, SSA would have to add a field to RPS if it wanted to store data as it does for the MBR and SSR.  Presumably, an alternative would be for the agency to store information regarding the representative payee's preference with the beneficiaries' information in the MBR or SSR.

82.     SSA maintains that there are a number of stumbling blocks that stand in the way of providing alternate formats, including:  (i) the AFP format; (ii) personal identifiable information risk; (iii) the required five-day notice; (iv) mixed mode capabilities; (v) the sheer volume of notices; (vi) bar codes on notices; (vii) large fonts; and (viii) tables in notices.

83.     In addition to having various systems to collect and store information, the agency also uses several systems to create notices for Title II and Title XVI program participants. The majority of SSA notices are created in an advanced function presentation or advanced function printing ("AFP") format.  AFP is a standardized print format used for high-speed, high-volume production notices.  The majority of SSA notices are AFP files sent to commercial vendors for printing and mailing.  Vendors cannot manipulate the content of the AFP notice files. Some features that are available in word-processing software, like Microsoft Word or Word Perfect, such as changing font-size, are not available in AFP.  Because the AFP files created by

SSA are image files, they do not contain metadata or semantic information identifying the structure of the file, which is helpful for blind and visually impaired persons to read a table using a screen reader with a CD with Microsoft Word.  But there is evidence that the AFP file could be converted to a format that could be edited and then structure could be added.

84.     The agency also points to personal identifiable information risk as a problem. Notices contain personal identifiable information, including the individual's Social Security number, date of birth, name, and address.  There is a valid concern that if personal identifiable information is obtained by an unauthorized person, then it could present a security risk. The agency is particularly concerned about email presenting a risk, for example, if someone breached the email server and obtained access to many beneficiaries' information.  This does not present a problem for Braille or CDs to be mailed.

85.     The agency also states that there is a five-day problem.  SSA requires vendors to send notices immediately because the regulation presumes the program participants receive the notices within five days.  The regulations state that the "[d]ate you receive notice means 5 days after the date on the notice, unless you show us that you did not receive it within the 5-day period." 20 C.F.R. 404.901, 416.1401.  This five-day period, however, is self-imposed by SSA regulations.  As such, SSA can relieve itself of the five-day limit if need be.  Braille and Microsoft Word CDs could be sent within the five days.

86.     Next, the agency says there is a mixed-mode problem.  In mixed-mode format, material can be embedded in notices.  Banners, seals, signature lines, formatting — all of these items can be placed on the notice in mixed-mode format.  AFP can be in mixed-mode format. Because of the mixed-mode format, SSA can add these features to its notices and be consistent throughout the notices.  The use of AFP and mixed mode allows the agency to maintain a single, identifiable format.  No evidence was presented, however, to show that the agency could not send paper Braille notice with a uniform look if it tried to do so.  Likewise, nothing in the record demonstrates that the agency could not produce CDs with a uniform look.

87.     SSA contends that it cannot identify all class members because many blind or visually impaired individuals have applied for or receive benefits on bases other than blindness.

United States District Court

For the Northern District of California

The agency contends that it would have to send a mailer to all Title II and Title XVI participants, which would cost the agency approximately $31 million for printing and postage. In the past, the agency received inquiries from five percent of mailer recipients. So, in order to handle public inquiries in response to the mailers would cost the agency another $26.9 million. These cost estimates assume that SSA would have to send a mailer to *every participant*, all 66 million. The ordered relief, however, will take a different approach that entails sending notice to a much smaller subset of the SSA population.[1]

88.     According to the agency, all SSA notices have bar codes and present a problem for large-print documents produced by photocopying. The bar codes are used by the United States Postal Service for delivery of the notices. The bar code appears through a window of the envelope containing the notice. The agency has tried to enlarge a notice by photocopying it. Using this method of enlargement resulted in increased white space between the bar codes and the height of the bar code, and the postal service's automated equipment cannot read the enlarged bar code. Thus, the postal service would have to manually sort the envelopes. This, however, is mainly a problem for the postal service and not SSA. The agency would lose its mail discount for mail that can be sent automatically. But there was no evidence presented that this would impose an undue financial burden. One agency witness testified that a solution to this problem would be to produce the first page of a notice in standard size with the personalized information, including the address and bar code, and enlarge only the material information in the notice. True, this would require manual intervention. In any event, the ordered class-wide relief entails only paper Braille and a CD. There will be no bar code problem for these alternate formats.

89.     Yet another alleged burden are tables in notices. Tables are in some SSA notices, but not all notices. The tables in AFP files are not structured, meaning that there is no information in the AFP file identifying the presence of a table or that there are rows and columns or identifying the content of those columns, rows, and headers. But some tables do not have distinctive column headers.

---

[1] After the bench trial, plaintiffs filed a motion to strike the testimony of SSA witness Mark Graydon regarding the costs of sending a mailer to all Title II and Title XVI participants. Plaintiffs have not shown that they clearly asked for this information during discovery. Thus, plaintiffs' motion to strike is **DENIED**.

90.     AFP files do not contain metadata or semantic information identifying a table. If the content of the document from the AFP file is somehow converted to a PDF file, then a screen reader, such as Window Eyes, would read the table from top-to-bottom or left-to-right without saying a table exists.

91.     Tables would not present a prohibitive problem in a Braille document.  A large, wide table might have to be reformatted because an embossed page cannot fit as much information as a standard print page.  But tabular data can be recreated in Braille.  A person reading Braille could appreciate the structure of a table by using his or her hand to go down a column or across a row.

92.     SSA acknowledges that an AFP file could be converted to a Microsoft Word document and put on a CD.  The issue is that there would be no structure in the AFP document to identify a table.  For a screen reader to read a table, it is not necessary that it have structure, such as column and row header information.  Without that information, the screen reader would just read the table from left to right.  As the agency's witness acknowledged, the problem would be solved by providing structure in the notice.  So a combination of technology and manual intervention can address this "problem."

93.     The agency claims that yet another section of the Rehabilitation Act already imposes requirements that would be all the more burdensome were plaintiffs' proposed relief accepted.  Section 508 of the Rehabilitation Act, 29 U.S.C. 794d, states that electronic and information technology should be accessible to people with disabilities.  It applies to any electronic or information technology, including emails, website, audio files, CDs, PDF documents, and Microsoft Word documents.  According to the agency, two Section 508 standards apply to tables in electronic formats:  (1) row and column headers must be identified; and (2) data cells in the table must be associated with column and row headers when there are more than two rows or columns.  The agency contends that AFP files do not automatically contain this information.

United States District Court

For the Northern District of California

94.     SSA concedes that notices can be created in electronic formats that comply with Section 508 requirements with manual intervention to add structure to tables and for quality assurance.

95.     The agency has greatly exaggerated the burden and risks associated with extending accommodations beyond the SNP.  No estimate has been prepared regarding how much it would cost to provide plaintiffs' requested alternates.  The vast majority of SSA's "burden" and "risk" evidence is larded with speculation.  SSA regularly makes system changes and can also make one here without undue burden.  SSA has not made a convincing case for undue burden, at least as to the relief ordered below.

## ANALYSIS AND CONCLUSIONS OF LAW

### THE REHABILITATION ACT AND ITS REGULATIONS

96.     The central issue is whether SSA has failed to comply with Section 504 of the Rehabilitation Act and its implementing regulations.  Section 504 of the Rehabilitation Act prohibits discrimination against individuals with disabilities.  One purpose of the Rehabilitation Act is "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society, through . . . the guarantee of equal opportunity."  29 U.S.C. 701(b)(1); *see also American Council of the Blind v. Paulson*, 525 F.3d 1256, 1260 (D.C. Cir. 2008).

97.     Section 504 of the Rehabilitation Act, enacted in 1973, provides (29 U.S.C. 794):

> No otherwise qualified individual with a disability in the
> United States, as defined in section 705(20) of this title, shall,
> solely by reason of her or his disability, be excluded from the
> participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal
> financial assistance or under any program or activity conducted by
> any Executive agency or by the United States Postal Service.

98.     When this lawsuit began in 2005, SSA argued that Section 504 did not even apply to the issue at hand and that the SNP, having been enacted by Congress, was the sole requirement.  SSA now concedes, however, that Section 504 does apply.  This history is important because it explains why the agency never bothered to comply with the implementing Rehabilitation Act regulations, such as the notice-of-rights requirement described below.

99.     To implement Section 504, the Department of Health and Human Services promulgated regulations in 1988 that set forth important requirements.  One such requirement was that a notice of rights must be provided to individuals with disabilities.  45 C.F.R. 85.12. Section 85.12 provided that the agency should make available "such information regarding the provisions of this part and its applicability to the programs or activities conducted by the agency, and make such information available to them in such a manner as the agency head finds necessary to apprise such persons of the protections against discrimination assured them by section 504 and this part."  The comments to the regulation stated that (53 Fed. Reg. 25,595, 25,599 (July 8, 1998), as corrected, 53 Fed. Reg. 26,559 (July 13, 1988)):

> Section 85.12 requires the agency to disseminate sufficient information to employees, applicants, participants, beneficiaries, and other interested persons to apprise them of the rights and protections afforded by section 504 and this part.  Methods of providing this information include, for example, the publication of information in handbooks, manuals, and pamphlets that are distributed to the public to describe the agency's programs and activities or in connection with recruitment; the display of informative posters in service centers and other public places; or the broadcasting of information by television or radio.

100.     No such notice of rights has ever been given to blind and visually impaired individuals by SSA.  This was a violation of the Act.

101.     In addition, "the agency shall ensure that interested persons, including persons with impaired vision or hearing, can obtain information as to the existence and location of accessible services, activities, and facilities."  45 C.F.R. 85.51(b).[2]

102.     In addition to requiring a notice of rights, the regulations provide that (45 C.F.R. 85.51):

> (a)     The agency shall take appropriate steps to ensure effective communication with applicants, participants, personnel of other Federal entities, and members of the public.
>
> (1)  The agency shall furnish appropriate auxiliary aids where necessary to afford an individual with handicaps an equal opportunity to participate in, and enjoy the benefits of, program or activity conducted by the agency.

---

[2] 45 C.F.R. 85.11 states that the agency shall evaluate its policies and practices and modify those that do not meet the requirements of that part.  In plaintiffs' post-trial brief, they state that they do not seek a private right of action for enforcement of Section 85.11 (Br. at 9 n.17).

United States District Court
For the Northern District of California

(i)  In determining what type of auxiliary aid is necessary, the agency shall give primary consideration to the requests of the individual with handicaps.

(ii)  The agency need not provide individually prescribed devices, readers for personal use or study, or other devices of a personal nature.

103.    The implementing regulations define "auxiliary aids" as "services or devices that enable persons with impaired sensory, manual, or speaking skills to have an equal opportunity to participate in, and enjoy the benefits of, programs or activities conducted by the agency." 45 C.F.R. 85.3.  The regulations then go on to name "readers, Brailled materials, [and] audio recordings" as examples of auxiliary aids that are appropriate for persons with impaired vision. *Ibid.*  Similarly, the section-by-section analysis states that "[f]or vision-impaired persons, effective communication might be achieved by several means, including readers and audio recordings."  53 Fed. Reg. at 25602.

104.    But there are limits on the action the agency must take.  Subpart (ii) makes clear that the agency need not provide individually prescribed devices, such as a reader (or computer or magnifying glass).  Perhaps more importantly for our case, Section 85.51(d) states that the agency is *not* required to take any action that it can demonstrate would result in a fundamental alteration in the nature of a program or activity or in undue financial and administrative burdens.  It further provides:

> In those circumstances where agency personnel believe that the proposed action would fundamentally alter the program or activity or would result in undue financial and administrative burdens, the agency has the burden of proving that compliance with § 85.51 would result in such alteration or burdens.  The decision that compliance would result in such alteration or burdens must be made by the agency head or his or her designee after considering all agency resources available for use in the funding and operation of the conducted program or activity in question and must be accompanied by a written statement of the reasons for reaching that conclusion.  If an action required to comply with this section would result in such an alteration or such burdens, the agency shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with handicaps receive the benefits and services of the program or activity.

United States District Court

For the Northern District of California

105.    "Any interpretation of [Section] 504 must . . . be responsive to two powerful but countervailing considerations — the need to give effect to the statutory objectives and the desire to keep [Section] 504 within manageable bounds." *Alexander v. Choate*, 469 U.S. 287, 299 (1985).  The Supreme Court struck a balance between these two considerations by requiring "that an otherwise qualified handicapped individual must be provided with *meaningful access* to the benefit that the grantee offers." *Id.* at 301 (emphasis added).  A prior order herein has previously held that "defendants have a continuing duty under Section 504 of the Rehabilitation Act to provide meaningful access to all visually disabled recipients of and applicants to Social Security programs" (Dkt. No. 78 at 12).

106.    While Section 504 requires meaningful access, it only entitles individuals to *reasonable* accommodations.  Accommodations are not reasonable if they would entail either an undue financial and administrative burden or a fundamental alteration in the nature of a program.  *Choate*, 469 U.S. at 301; *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 412 (1979).

107.    In the instant case, there are two main questions:  (i) whether blind and visually impaired plaintiffs have "meaningful access" to SSA notices, and (ii) if not, whether the acts necessary to achieve meaningful access would impose an "undue burden" on SSA.  *See Choate*, 469 U.S. at 301; *Davis*, 442 U.S. at 412.

108.    SSA has not provided meaningful access for its Title II and Title XVI programs to all blind and visually impaired individuals as required by Section 504.  Nor has it provided effective communication for all plaintiffs, as required by Section 85.51.

109.    Acknowledging that the decisions addressing meaningful access are fact-specific, the D.C. Circuit has stated that the decisions reflect the following general pattern:

> Where the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit.  By contrast, where the plaintiffs seek to expand the substantive scope of a program or benefit, they likely seek a fundamental alteration to the existing program or benefit and have not been denied meaningful access.

*American Council of the Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008).

United States District Court

For the Northern District of California

110.    In this action, the pervasive use of standard print only is the obstacle impeding plaintiffs' access.  Plaintiffs simply cannot read them without help.  In *Choate*, on which defendants heavily rely, the Supreme Court concluded that a state was not required to expand the durational limits of its inpatient coverage to meet the greater medical needs of handicapped Medicaid recipients.  469 U.S. at 301.  In contrast, plaintiffs here do not seek to expand the substantive scope of a SSA program or benefit but, rather, seek better notification.  They seek forms of notice as easy for them to "read" as print notices are for everyone else.

111.    To date, the agency has made no attempt to comply with Sections 85.12 or 85.51.  It was not until this lawsuit that the agency considered whether Section 85.51 even applied.  On motion to dismiss, SSA asserted that its duties under Section 504 were confined by the special-notice provisions enacted by Congress.  SSA argued that the special-notice provisions were somehow a "legislative declaration" of the agency's duties under the Rehabilitation Act.  An April 2008 order rejected that argument.  Holding that Section 504 trumped the special-notice provisions, the order stated that "Congress intended to *improve* the notice provided to blind recipients when it passed the special notice provision, not to *limit* such notice" (Dkt. No. 78 at 12).

112.    Congress amended the Social Security Act to provide blind individuals with the option of receiving a telephone call or certified mail.  Notably, Congress also left the door open to a third option and provided for "notification by some alternative procedure established by the Commissioner of Social Security and agreed to by the individual."  42 U.S.C. 421(l), 1383(l).  This shows that Congress recognized that its SNP option would not be effective for everyone.

113.    While acknowledging that it must provide meaningful access to notices of Social Security programs, SSA has steadfastly refused to expand the alternatives beyond the SNP.  SSA contends the SNP already constitutes an "effective" means of communication within the meaning of the regulation.  The section-by-section analysis states that the "agency shall honor the [individual's] choice unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under [Section] 85.51(d)."  53 Fed. Reg. at 25602.  True, both the regulation and its section-by-section analysis list "readers" as an

United States District Court

For the Northern District of California

example of a means of effective communication.  45 C.F.R. 85.3 (listing "readers, Brailled materials, [and] audio recordings" as examples of auxiliary aids); 53 Fed. Reg. at 25602 (naming "readers and audio recordings" as examples of auxiliary aids).  According to SSA, agency employees act as "readers" during the supplemental telephone call under the SNP.  Significantly, however, neither the regulation nor the section-by-section analysis says that the *only* useful aid would be a reader.  Instead, by listing options in addition to readers, both recognize that other services and devices, such as Braille and audio recordings, might also be useful and provide effective communication.

114.    In SSA's defense, it is hard to say that the SNP was not "effective" for at least a large number of blind and visually impaired since it was specifically conceived and imposed by Congress.  Presumably Congress acted wisely.  But time and the tools available have progressed and the blind and visually impaired have adapted to more modern tools, such as computerized voice synthesizers.  The SNP was a reasonable step taken to assist the blind and visually impaired, especially in 1988 and 1990.  Since then, great strides have been made in computer-aided assistance for the blind, again such as voice synthesizers and navigation tools that can read and navigate through a document.  The availability of a Microsoft Word document on a CD is so much more advanced that a telephone call can no longer be deemed to be as effective as computer-aided synthesizer and navigation tools, as least for the visually impaired who use such tools.  Put differently, Congress imposed the SNP as a minimum and expected the agency to add other aids as they became available and practical, just as Congress had already required in Section 504.

115.    Section 504's implementing regulations require that the agency take steps to ensure effective communication.  No such steps have been taken in the instant case.

116.    Contrary to Section 85.51(a)(1)(i), SSA has not given primary consideration to the requests of the blind and visually impaired for alternative formats.  The section-by-section analysis states that the agency shall provide "an *opportunity* for individuals with handicaps to *request* the auxiliary aids of their choice [and] [t]his expressed choice shall be given primary consideration by the agency."  53 Fed. Reg. at 25602 (emphasis added).  That choice should be

United States District Court

For the Northern District of California

1    honored unless the agency shows that another effective means of communication exists or that

2    the individual's requested means of communication would cause an undue financial and

3    administrative burden.  *Again, agency employees are told that the SNP is the sole remedy*

4    *available.*  They are instructed to offer the SNP options in response to an individual's request

5    for an alternate.  Thus, there is no genuine opportunity to make a request, and no consideration

6    is given to the requests that are made.  Rather, SSA's blanket policy is to deny requests.  SSA has

7    never undertaken an administrative review of any requests for accommodations.  Therefore,

8    plaintiffs are never given any administrative process under Section 85.51.  (The only exception

9    to this conclusion concerns the one case file in the San Mateo District Office.)

10          117.    Plaintiffs seek to have the agency provide its standard-print notices in alternative

11   formats, such as Braille, large print, audio CD, cassette tape, and e-mail.  Notices are not now

12   provided in any of these formats.  SSA agrees that the accommodations requested by plaintiffs are

13   at least facially reasonable (Def. Resp. to Pl. Prop. Findings at 34).  Depending on the individual,

14   the alternative formats requested by plaintiffs can be effective mechanisms for communication.

15   The blind cannot all be expected to master the same accommodation method.  Each must cope in

16   the way best suited to him or her.  One size cannot fit all.  On the other hand, we cannot expect

17   SSA to supply every conceivable alternative across all blind and visually impaired individuals

18   regardless of the cost.  Communications with the blind can never be truly and exactly equal.

19          118.    Section 85.51 does not expressly require a format that is "as effective as" that

20   provided to sighted people who can read.  To argue otherwise, plaintiffs cite *Hayden v. Redwoods*

21   *Community College District*, No. C-05-01785, 2007 U.S. Dist. LEXIS 835 (N.D. Cal. Jan. 8,

22   2007).  The regulation in *Hayden* explicitly required public entities to "take appropriate steps

23   to ensure that communications [with individuals with disabilities] are *as effective as*

24   communications with others."  *Id.* at *24 (quoting 28 C.F.R. 35.160) (emphasis added).

25   In contrast, the regulation here says the agency shall "take steps to ensure *effective*

26   communication" with individuals with disabilities.  45 C.F.R. 85.51(d) (emphasis added).

27   It further requires that the agency furnish aids that afford "an *equal opportunity* to participate in,

28   and enjoy the benefits of, program or activity conducted by an agency."  *Ibid.* (emphasis added).

United States District Court

For the Northern District of California

Significantly, the words "as effective as" are absent from Section 85.51(d).  This order recognizes that Section 85.21(b)(1)(iii), on the other hand, says that the agency may not provide an "individual with handicaps with an aid, benefit, or service that is not *as effective* in affording equal opportunity to obtain the same result . . . ."  Section 85.21 (b)(1)(iii) "requires that the *opportunity* to participate or benefit afforded to an individual with handicaps be *as effective* as that afforded to others."  53 Fed. Reg. at 25599 (emphasis added).  In any event, regardless of what accommodation is provided, the fact that someone has a sight disability makes it impossible for that person to "read" as effectively as someone who has no disabilities, all other things being equal.  This is a fact of life.

119.    The SNP does not ensure effective communication or equal opportunity "to the maximum extent possible" within the meaning of Section 85.51(d).

120.    SSA asserts that Section 504 does not require the agency to engage in an individualized inquiry and instead the agency can act by general principle, *i.e.*, by providing the SNP option.  The agency has made a similar argument before.  Previously arguing against class certification, SSA asserted that because plaintiffs proposed five specific types of accommodations, an individualized inquiry into the specific accommodation for each class member would be required.  An order certifying the class disagreed (Dkt. No. 126 at 5–6):

> What is at issue in this action, and what plaintiffs must prove is whether the SSA has failed to comply with Section 504 of the Rehabilitation Act and the due process clause.  It makes little difference that plaintiffs here have suggested possible ways in which they believe the SSA could fulfill its purportedly neglected duties.  At the appropriate time (if defendants are found to have neglected their duties under the Rehabilitation Act or the due process clause), the issue of what type of accommodation should be made [will be addressed].  This order does not expect that this issue will require an individualized inquiry with respect to each putative class member.  For example, class members could be given notice and a choice of what type of accommodation they would prefer.

121.    In support of its position, defendant cites *Traynor v. Turnage*, 485 U.S. 535, 551 (1988), and *Ward v. Skinner*, 943 F.2d 157, 162 (1st Cir. 1991).  Both are distinguishable.

In *Traynor*, the Supreme Court stated that

> [Section 504] does not demand [an individual] inquiry into whether factors other than mental illness rendered an individual veteran's drinking so entirely beyond his control as to negate any degree of

31

United States District Court

For the Northern District of California

1

2

> "willfulness" where Congress and the Veterans' Administration have reasonably determined for purposes of the veterans' benefits statutes that no such factors exist.

3   485 U.S. at 551.  The First Circuit in *Ward* interpreted *Traynor* as holding

4

5

6

7

> that an agency, in treating handicapped persons, may sometimes proceed by way of general rule or principle, at least where (i) the agency behaves reasonably in doing so, (ii) a more individualized inquiry would impose significant additional burdens upon the agency, and (iii) Congress, as well as the agency, has expressed some kind of approval of the general rules or principles concerned.

8   943 F.2d at 162.  As stated, no individualized inquiry is necessary here.[3]

### UNDUE BURDEN DEFENSE

9

10   122.   SSA is not required to take any action that it can demonstrate would result in

11   undue financial and administrative burdens.  45 C.F.R. 85.51(d); *see also Southeastern*

12   *Community College v. Davis*, 442 U.S. 397, 412 (1979).  SSA has the burden to show that

13   compliance with Section 504 and Section 85.51 would result in such a burden.  But SSA has not

14   carried its burden here.  Under Section 85.51(d), the agency is also not required to take any action

15   it can show would result in a fundamental alteration in the nature of a program or activity.  In this

16   action, the agency relies on an undue burden defense, not a "fundamental alteration" defense.

17   123.   Section 85.51(d) provides that the agency head or his designee must make a

18   decision that compliance would result in a burden "after considering all agency resources

19   available for use in the funding and operation of the conducted program or activity in question

20   and must be accompanied by a written statement of the reasons for reaching that conclusion."

21   Despite this requirement, there is no evidence that there was a consideration of the available

22

23

24

25

26

27

28

---

[3] SSA contends plaintiffs have no private right of action to enforce the regulations in this case.  The agency argues that plaintiffs have impermissibly read formal procedural requirements into Section 85.51(a) that are not supported by the regulation's text or section-by-section analysis.  The text of the regulation clearly states that the "agency shall take appropriate steps," including "giv[ing] primary consideration" to individuals' requests.  45 C.F.R. 85.51(a)(1).  Likewise, the section-by-section analysis, says that "Section 85.51 requires the agency to take appropriate steps" and "[t]hese steps shall include procedures for determining when auxiliary aids are necessary" and "an opportunity for individuals [] to request the auxiliary aids of their choice."  53 Fed. Reg. at 53602.  Both the text and analysis clearly require the agency to provide an opportunity for individual to request an auxiliary aid and then to consider that request.  *See generally Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999) (recognizing a need for the defendant to gather information from the disabled individual to determine what accommodations were necessary).  Plaintiffs have shown that this is necessary to ensure meaningful access.  *See Mark H. v. Lemahieu*, 513 F.3d 922, 93 8n. 14 (9th Cir. 2008).  In the instant case, a failure to comply with the regulations promulgated under Section 504 is also a failure to comply with Section 504.  *Alexander v. Sandoval*, 532 U.S. 275, 286 (U.S. 2001).

United States District Court

For the Northern District of California

resources.  Also, no written statements were ever made, much less by the head of the agency.
No determination was made outside this litigation that it would be an undue burden to provide
alternative formats.  Sad to say, SSA has disregarded the entire Section 85.51(d) procedure.
Tellingly, until this lawsuit, SSA believed that Section 504 did not even apply.  Rather, SSA's
practice was based solely on its view that it only needed to provide the SNP option.

124.    As found above, there is already a burden on SSA in providing the telephone call
under the SNP.  In some instances, particularly when compared to a long notice being read over
the telephone, burning a CD or providing Braille alternates would actually save the agency time.

125.    The agency has not demonstrated that there would be an undue financial and
administrative burden to provide a Braille option.  SSA already provides some publications in
Braille.  The agency actually offered Braille notices at one point in the past to recipients.
While "[a]n institution's past decision to make a concession to a disabled individual does not
obligate it to continue to grant that accommodation in the future, nor does it render the
accommodation reasonable as a matter of law," it does provide persuasive evidence that the
accommodation was reasonable.  *Wong v. Regents of University of California*, 192 F.3d 807,
820 (9th Cir. 1999) (stating that the fact that the school previously made the exact modification
that the plaintiff requested would be persuasive evidence that the accommodation was
reasonable).

126.    Nor has any undue burden been proven as to providing a Microsoft Word CD as
an alternate format option.  One of the agency's own employees has demonstrated how easily this
could be done.  Karen Sims, a SSA district manager, provided CDs to one of the named plaintiffs
for years.  These contained the agency's notices and correspondence to her.  Section 504 requires
what Sims did — she made an individual one-off accommodation by sending notices in CD form.
The agency has not shown that making this option available to all who request it would be unduly
burdensome.  Providing CDs would be equal to or less than the burden of providing the SNP
telephone call in light of the length of time it takes to read the notice verbatim, particularly the
boilerplate language and tables.  In fact, there is agency testimony that it "would be easy" to burn
a CD.

United States District Court

For the Northern District of California

127.     Both the MBR and SSR already have a valid value for Braille.  As such, an additional value would only be needed for the CD option.  Providing Braille and a CD would not impose undue financial and administrative burdens in excess of what is required by Section 504 and Section 85.51.

128.     As stated, the agency invokes a different section of the Rehabilitation Act. Section 508 provides than an agency's electronic and information technology must be accessible to the blind and visually impaired.  The government already has a duty to comply with Section 508.  It would be topsy-turvy for it to refuse to comply with Section 504 because to do so would also require undue-burden compliance with Section 508.  Section 508 was enacted to *increase* the rights of blind and visually impaired individuals, not to decrease their rights. Section 508 itself says that the agency does not have to comply with its provisions if Section 508 would impose an undue burden.  29 U.S.C. 794d(a)(1)(A).  As such, the existence of Section 508 does not support the agency's undue burden argument.

129.     Furthermore, when directly asked about the possibility of providing individuals with a CD on it, Mr. Baker conceded it could be done.  The Court asked Mr. Baker about this at trial (Tr. 959:25–960:19):

> **THE COURT:**  But why can't we give blind people a CD that they can stick in their computer so Window-Eyes can read the table?
>
> \*          \*          \*
>
> What is the answer to this?  Can we solve this problem?  How hard is it to solve?
>
> **THE WITNESS:**  We can solve this problem with a combination of technology and manual intervention.  And that's the way we'd solve it today.  Okay.  I am not saying that we can't solve the problem.  I'm saying that there is not a fully automated solution that will do it for us.  And that because we have a very high volume of notices to deal with, we have to look at how we can solve the problem efficiently.

130.     With respect to the requested alternate formats, the agency has not provided any estimates of the costs of implementation.  It is mere speculation that the suggested accommodations would be costly and therefore burdensome.  There is no credible evidence that it would be unduly burdensome to offer Braille for those who request it.  Likewise, there is no

United States District Court

For the Northern District of California

1    evidence that providing a CD option would be any more expensive than regularly providing SNP

2    options.

3           131.    Contrary to the agency, a major system overhaul would not be required.  The input

4    systems were previously changed to provide for Braille.  This shows that changes can be made.

5    There has been no showing that the system changes would be an undue burden.  Change must be

6    carefully done, of course, but the system has been changed before and the agency is trained to do

7    it.  The changes needed to provide Braille and a CD require only small low-impact changes to the

8    systems.

9           132.    With respect to the burden, the government has assumed worst-case scenarios and

10   the worst set of assumptions.  SSA has invented worst-case hypothetical nightmare burdens, but it

11   has not done a realistic assessment of what would really be needed, *e.g,* no "risk assessment" has

12   been done.  The entire defense has been to exaggerate what relief might be ordered and to invent

13   multiple excuses why the alternates cannot be done rather than find one reason why any could be

14   done.  At all events, the agency has not shown there is an undue burden regarding some of the

15   alternative formats.  This order, therefore, concludes that at least Braille and data CDs with

16   Microsoft Word would be feasible and effective for many, and not unduly burdensome.

17          133.    Audio cassettes are now passe and will not be ordered on a class-wide systematic

18   basis.  Large print is too burdensome and those with low vision can read existing notices with

19   magnifying glasses or other home tools and/or will be able to benefit from the CD relief that is

20   ordered.  Email would be very handy but the risk of personal identifiable information being stolen

21   is too great.  It would be too easy for criminals to send phony emails to class members and trick

22   them into providing their personal identifiable information.  Contrary to plaintiffs' counsel, no

23   federal agency today sends emails to beneficiaries and recipients.  These forms of relief will not

24   be ordered on a class-wide basis but this will be without prejudice to individuals making

25   individual requests therefore pursuant to Section 85.51.  If an individual receives an alternate

26   form of relief under this order, then the agency should not have to also call and read the notice to

27   them verbatim under the SNP.  Otherwise, it would be a double burden on the agency.

28

**United States District Court**
For the Northern District of California

134.   The Court realizes that this order does not grant all of the menu of accommodations sought by the class representatives.  The *entire* list has not yet been shown to be feasible or necessary in light of the relief granted above.  To order the full menu of alternatives to be supplied on a system-wide basis is unwarranted.  Braille will cover most older recipients and recipients blind from birth.  A Microsoft Word CD will cover recipients with access to computers.  These two groups overlap and it is highly likely that one alternative or the other (or both) will satisfy the vast majority of blind and visually impaired individuals, not to mention those that will prefer the SNP.  The agency has offered Braille in the past and has supplied Microsoft Word CDs in the past.  It can do so on a system-wide basis without undue burden.  Once these are in place, it seems highly probable that there will be an effective alternative for all blind and visually impaired individuals.  Even Section 504 does not require an agency to supply a menu of alternatives longer and wider than necessary to supply at least one effective alternative.

135.   The Court is confident that the Microsoft Word CD and Braille alternatives, taken together with the existing SNP, will provide the vast majority of class members a choice of an "effective means of communication."  53 Fed. Reg. at 25602.  In the event that these alternatives are not effective for an individual, he or she may request that the agency provide an individual accommodation.

### DUE PROCESS

136.   The next question is whether the mailing of SSA's standard-print notices violates due process under the Fifth Amendment, which prohibits the United States from depriving any person of property without due process.  Individuals whose property interests are at stake are entitled to notice and an opportunity to be heard.  *Dusenbery v. United States,* 534 U.S. 161, 167 (2002).

137.   The parties dispute which standard applies to the due process challenge herein.  Plaintiffs argue that *Mathews v. Eldridge*, 424 U.S. 319 (1976), supplies the appropriate test while defendants argue that the applicable standard is found in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).

1    138.   For the sake of argument, this order accepts plaintiffs' version.  Even so, this order

2    finds that plaintiffs have not proven a class-wide violation of due process.

3    139.   The due process standard under *Mathews* requires consideration of three factors:

4        First, the private interest that will be affected by the official action;
         second, the risk of an erroneous deprivation of such interest through
5        the procedures used, and the probable value, if any, of additional or
         substitute procedural safeguards; and finally, the Government's
6        interest, including the function involved and the fiscal and
         administrative burdens that the additional or substitute procedural
7        requirement would entail.

8    424 U.S. at 335.  *Mathews* involved SSA.  *Mathews* identified the sole private interest at stake as

9    being the uninterrupted receipt of benefits pending a final administrative decision because a

10   recipient whose benefits are terminated receives full retroactive relief if he ultimately prevails.

11   After evaluating the three factors, the Supreme Court concluded that the agency's administrative

12   procedures fully comported with due process in *Mathews*.

13   140.   Here, the subject of notices range from suspension or termination of benefits to

14   general information such as SSA rules governing benefit programs.  For notices with general

15   information, the potential deprivation of an interest is low.  With respect to suspension or

16   termination of benefits, the potential injury is greater.  Regarding the second factor — the risk of

17   an erroneous deprivation of benefits through the procedures used — SSA's procedure of sending

18   notices under the SNP is fair and reliable.  Notices that deal with a decision affecting benefits are

19   covered under the SNP.  As stated, when a person elects the telephone option, the notice is not

20   only sent by mail but also followed up with an agency employee calling to read the notice.

21   Any risk of deprivation is also ameliorated through the good-cause policy in which plaintiffs

22   may usually be granted a good-cause waiver on the basis of their blindness to file a late appeal

23   regarding a deprivation of their benefits.  Furthermore, as stated, there is only limited and

24   anecdotal evidence that any class members have lost benefits after SNP notice.  While receipt of

25   benefits is very important, recipients are already accorded substantial procedural protection.

26   The recipient is given at least two forms of notice and an opportunity to be heard.  As to the third

27   factor, this order has addressed the "burdens" that the government claims would be involved

28   and concluded that while there may be a burden there is not evidence of a substantial burden.

United States District Court

For the Northern District of California

37

1    Taking the three factors into account, the balance weighs in favor of finding that due process is

2    provided — even under *Mathews*.  At a minimum, it can be said that plaintiffs have not shown a

3    deprivation of due process on a class-wide basis.

4          141.    On the other hand, extreme individualized instances may occur from time to time

5    in which someone is denied due process because of unique facts and circumstances that cannot be

6    adjudicated on a class-wide basis.  The denial of the class-wide due process claim is without

7    prejudice to such an individualized case.

8                                **RELIEF GRANTED**

9          With respect to the scope of relief, a district judge would ordinarily consider remanding

10   the issue of systematic relief to the agency so that it could pursue system-wide rulemaking in

11   the first instance.  The litigation posture taken by SSA herein militates decidedly against this

12   approach, however.  Back in 2008, after an order ruled against SSA on whether Section 504

13   applied to the problem at hand, the Court invited both sides to comment on which of four

14   alternatives should be pursued (Dkt. No. 78 at 12–13):

15             1.    Actively continue litigating this case under
                 Section 504 of the Rehabilitation Act, decide the issue of class
16               certification, and determine the scope of relief, if any.

17             2.    Stay the proceedings of the case so that the agency
                 can engage in rulemaking or pursue other agency action in light of
18               the ruling on the merits made herein.  This course would require
                 that the agency concede the correctness of this ruling on the merits.
19               The Court would maintain jurisdiction to review any rule or policy
                 subsequently adopted.

20
                 3.    Remand the action to the agency for rulemaking or
21               other agency action.  This would also require that the agency
                 concede the correctness of this ruling on the merits.  This course,
22               however, might be problematic because there seems to be no
                 affirmative agency action forming the predicate for original
23               subject-matter jurisdiction.

24             4.    Certify this order for interlocutory review under
                 28 U.S.C. 1292(b) and stay all proceedings.
25
     Both sides, including SSA, requested that the litigation continue with a decision on the merits.
26
     Having spurned the opportunity for a stay pending rulemaking, the agency has, in effect,
27
     consented to resolve the case by litigation, not rulemaking.  The agency has litigated the entirety
28

**United States District Court**
For the Northern District of California

of the issues under Section 504 and Section 85.51, including the question of undue burden as to the proposed alternatives at trial.

For the same reason, this order will not merely order the agency to henceforth comply with Section 85.51 (the provision allowing individuals to ask the agency for an accommodation in the form of communications).  SSA has spurned that opportunity and chosen to litigate on a class-wide basis.  Moreover, until this litigation was underway, the agency refused to even acknowledge that it was obligated to follow Section 504, routinely denying individual requests for accommodation.  In this litigation, it has been quick to find lame excuses for noncompliance but exceedingly slow to favor accommodations.  To merely order the agency to comply with Section 85.51 would lead to more lame excuses with no accommodations.  Since the agency has chosen to litigate this case on a class-wide basis, this order will require relief on a class-wide basis.  Consequently, the following relief is ordered:

1.      For all notices and other communications with blind and visually impaired and Title II and Title XVI recipients and authorized representatives, defendants shall develop and shall offer a Braille alternative and a navigable Microsoft Word CD alternative no later than **APRIL 15, 2010**.

2.      By **DECEMBER 31, 2009**, defendants shall provide notice to all recipients and authorized persons shown in its records to be blind or visually impaired:

(a)      advising of the availability of the foregoing new alternatives and giving them an opportunity to elect one of the two above alternatives with an effective date of **APRIL 15, 2010**.  The notice should advise that selection of one of the two alternatives would discontinue any special notice previously selected under the special notice policy, *i.e.*, that the recipient would not be entitled to both a SNP notice as well as a new alternative.  The newest alternatives, to the extent selected, would relieve the agency of the burden of making the SNP notice and, to that extent, would be less burdensome on the agency; and

(b)      advising that the blind and visually impaired are individually entitled to ask defendants to provide any other alternative accommodation

**United States District Court**

For the Northern District of California

1    preferred by said individual.  The notice shall describe the Section 85.51 procedure

2    and fully comply with its duty to advise as to rights.  This order is without

3    prejudice to future relief to any individual pursuant to any such individual request

4    pursuant to Section 85.51 and the agency is hereby ordered to comply in good faith

5    with Section 85.51.

6        3.      In addition to the notice required by Paragraph 2, defendants shall make an

7    appropriate announcement on its website and shall train its staff dealing with the blind and

8    visually impaired to communicate orally the notice described above when such individuals call

9    in, email in, or write in, all to be effective by **APRIL 15, 2010**.  The Court realizes that there will

10   be some blind and visually impaired recipients whose impairment will not be noted in the

11   records and thus those individuals will not receive the mailed notice required by above.

12   Those individuals, however, may learn of the expanded options via the website and/or through

13   telephone communications.  This order finds that more expansive dissemination of the written

14   notice would not be worth the incremental financial burden.  The American Council of the Blind

15   is hereby requested to give appropriate notice of the relief ordered herein to as many blind and

16   visually impaired individuals as feasible through its website and publications.  The Court finds

17   that in due course everyone with a need to know the change will be fully informed.

18       4.      By **NOVEMBER 25, 2009**, defendants shall file a specific description of the Braille

19   and Microsoft Word CD it proposes to offer, the specific form of notice, and its specific plan of

20   dissemination.  It shall also spell out a systematic plan for receiving and ruling on requests for

21   accommodation under Section 85.51.  By **DECEMBER 4, 2009**, both sides shall meet-and-confer

22   in person on the adequacy of the proposal as well as on the form of notice and manner of

23   dissemination.  Any objection must be filed by **DECEMBER 18, 2009**, and any response thereto

24   by **DECEMBER 29, 2009**.  A hearing shall be held if needed.

25       5.      By **APRIL 16, 2010**, defendants must file a certificate of compliance under oath

26   stating in detail what was done to comply with this order.

27       6.      After **APRIL 16, 2010**, no social security benefits may be reduced or terminated to

28   any individual shown in the SSA records to be blind or visually impaired (or whose authorized

payee is shown to be blind or visually impaired) unless such person was first provided with the notice prescribed above and the method of notice, if any, selected by said person was followed.

   7.   The Court will retain jurisdiction to enforce this order, including to monitor whether it is complying with its duties under Section 85.51.


**IT IS SO ORDERED.**


Dated:  October 20, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California